This is to clarify the Embassy of Japan's overseas holdings of the Japanese Greek Spirits and the intention of the Embassy of Japan to travel Japan and other Asian countries You can do that afterwards through the clerk's office. I thought we were on notice that Mr. Feng was going first. Oh, sorry. I was going to go first, then Mr. Feng is going to take five minutes. Okay. You have ten minutes then. Right. And I'd like to reserve two, so if I could have eight minutes on the clock. All right. Thank you. Andrew Holmes, on behalf of law offices of Feng & Associates, Mr. Feng is going to be representing himself in the oral argument. So just to begin with, our primary argument is these are not securities. I understand why the SEC wants to regulate this area, but not all EB-5 programs are securities. They know this, and it's ironic, actually, that the SEC, who often accuse others of elevating the form over substance, in our opinion, are doing exactly that here. Isn't the pooling feature of this – I mean, I think I might agree that if somebody just that wouldn't necessarily be a security. But doesn't the pooling feature of this program, if you will, turn it into a security? And that may be under that portion of the analysis. The portion that we're focused on for why it isn't a security is because there can be no profit. Okay. Look, but assume for a second there can. If there can be a profit, then wouldn't the pooling turn it into a security? I think it likely would. So your entire argument turns on the absence of the ability to get a profit? That and an extension of U.S. v. Foreman, or Foreman versus – Housing Foundation versus Foreman. Yeah. Reading your brief, I thought you had argued that the nature of these investments meant that they couldn't be securities. I think they can be securities, and I think that there is precedent for that. But it doesn't mean they're all securities. And you have to look at each particular investment and the subjective situation around each one to decide. Counsel, when you focus on expectation of profit, are you talking about – because you seem at points in your brief to be doing this, to be talking about the subjective expectations of your clients as opposed to an objective analysis of the applicable documents. I mean, you talk about how they're – they were interested in getting the visas. They really didn't care about making money, and so they did – they really did not have an expectation of profit. Is that what you're focusing on, their subjective expectations? Essentially, subjective expectations – That doesn't conform to the law, does it? It's not a – Actually, it does. There – it does if you look – SEC versus Howey, the third prong, is dead on point here because there's a difference between the U.S. Customs and Immigration Service and the SEC determination of how this works. The entire thing hinges on is it a $500,000 minimum investment or is it a $500,000 plus $45,000 or $50,000 minimum investment. And that's it, because if you include the administrative or marketing fee or however it's designated, the required fee, which is required in every single one of these as part and parcel of the invested amount in order to participate for any immigrant investor, that amount makes it mathematically impossible to ever go somewhere. I thought there was evidence – I thought there was evidence in this case that one – at least one investor made a profit. There was one. So then it's not mathematically impossible. And I did point that out. So it's mathematically unlikely but not impossible. Right. And in that instance, for that one investor, it is not mathematically impossible. And we footnoted that as you – No, you disclosed it, but then why – is it mathematically impossible for all or just unlikely because they're going to pull out sooner? It is mathematically impossible. You cannot do it. And there's an exhibit that actually shows why. What if the venture becomes wildly successful? It doesn't matter. Their rate of return is limited over five years to an amount that makes it absolutely impossible mathematically to do any better and to actually make a profit above and beyond the 500 plus whatever that marketing – So if the fee charged was lower, this would be a security? No. If the fee charged – if the – sorry. Yeah. If the fee that your clients charged was – Right. If either the interest rate was higher – Was much lower, this would be a security? If either the interest rate was higher or if the – and it wasn't a fee that my client charged. Yeah. I'm not trying – I'm trying to deal with only one component so we don't have to play games. If the administrative fee – If the administrative fee was zero. If the administrative fee was zero – This would be a security. Then it might be. Yeah. But those aren't our facts, so I haven't addressed this. Well, that's why – that's why I said it was a hypothetical. It is a hypothetical. And I would probably have to concede that in that instance it could be a security. So whether it's a security or not depends on the amount of the administrative fee charged? Well, if – Yes? If you're looking at – if you agree that the Howey test requires there to be an expectation of profit – No, I'm asking about your position. Your position is that whether it's a security or not depends on the amount of administrative fee charged? It can depend on that, yes. And it also can depend on the amount of interest? Absolutely. Okay. Yeah. So – and, you know, if you're looking for the – for the proof that backs up the mathematical impossibility, it's at SER 240 to 241. There are two pages of the spreadsheet that show what the rate of return was for each one, what the – what the marketing or administrative fee was for each one. Simple math shows you that over the five-year duration of all of these, you cannot possibly make a profit on all but the one that we footnoted. So if I sell stock in a company to somebody that has no business and I – and it's doomed to fail, is that – that's not a security because they couldn't possibly have made a profit? No, because you don't have an absolute certainty of that. That isn't a mathematical impossibility. Well, what if there's an absolute certainty? There's absolute certainty. I'm selling – I'm selling stock in the air company. It'll give you the right to breathe the air. The absolute certainty that no profit will be received because it's the stupidest idea in the world. And maybe there's no liability because the misrepresentation isn't material. But isn't that a security? It could be in that instance. So then, therefore, the fact that it can't possibly give a return – I don't know what the subjective motivation of the investor is in that setting. And that's why this is a Foreman Plus analysis. That's why I'm saying it's not just one. It's what is your – what is your intent? Your intent is to get a green card, not to get a profit. In fact, it would be rational. But the problem is, what do you do about the fact that a lot of the placement circulars  Because – and this is the difference. The USCIS requires – there's an above – it's sort of an above the line, below the line, if you analogize it to taxes. The USCIS requires that this marketing or administrative fee is an above the line deduction and that the $500,000 be the part that has the possibility of a return. In the SEC context, the normal context, you have a PPM that says your investment is $550,000 and we're going to use $50,000 of it as marketing and administrative. That's a below the line. That's why I'm saying it's a form over substance. So in the offering materials, they're artificially separating it because the USCIS says, you've got to do it this way. So if my broker – if my broker – and I'll put aside – let's assume that this is a brokerage arrangement. If my broker recommends a stock to me and I expect to make money on it, but he charges me so much in fees, that as a practical matter, I never would, that's not a securities transaction? It – again, it's – you're talking about something that happens potentially by accident as opposed to something that is by design here. By design, you cannot make a profit. That's the problem here and that's why we think it isn't a security. You're giving an example that might make money, but there might be a tax reason. You know, tax advantages are things that can also qualify as the profit piece. There's no tax aspect to this at all. There is no benefit at all that is obtained by these folks. There is a benefit, of course. But that's a personal benefit. It's not transactional. But it's a package that's being sold and maybe what you're saying is, look, I'll sell you a package. There are two parts of it. One is the part to get you the green card. The other part is that we invest in a company. The investment in the company is going to turn out to be profitless to you, but you will get the green card. And you're saying we should separate the transaction into those two pieces. Exactly. And the SEC has precedent for that. Their no-action letter in Canaccord is exactly that. It is a no-action letter and it's cited in our papers, brief 12 and ER 439 to 451, where the SEC says in a Canadian analog to this EB-5 system where you can't get a profit, it is not a security. They have that guidance out there. I mean, it says the third element of the Howey test, the investor's expectation of profit again is not met by the facts which characterize the program. The sole motive of an individual participating in the program is to secure favorable immigration status in Canada. And an immigrant investor who would participate in the program with the goal of maximizing his or her return on investment would effectively be behaving in an economically irrational manner. They said in their own no-action letter, that's not a security. All right. Thank you, Counsel. You are well over your time. And Mr. Feng. Before we start, my clients are here, so we'll do it at that time. No, Counsel. We're not having any demonstrations here. Just make your argument. Because this concerns this case, SEC accused me fraud, and one of the element is the materiality. And my clients are here, and they have presented in their depositions and also in their declarations, which was not admitted by the lower court, that they don't care about those fees, and they are here for the green card. OK, let me start. What is this case really about? This is not a simple securities law enforcement case. This case threatens the founding principles of this country. Free enterprise, individual liberty, and a limited government. I'm speaking here not just for myself. I'm speaking here for hundreds of solo immigration attorneys who have been investigated or accused by the SEC for being unregistered brokers. By coincidence or not, immigration attorneys with a Chinese background are specifically targeted by the SEC enforcement. So far, including myself, three immigration attorneys are being sued by the SEC in federal courts. All of us are Chinese descendants and actually coming from China, born in China. Due to the SEC's lawsuits against immigration attorneys, overseas immigration agencies are now enjoying a monopoly over EB-5 advisory business without competition from U.S. licensed attorneys. Now, overseas clients do not know whether they can hire or should hire U.S. attorneys for EB-5 immigration matters. For many immigration attorneys like me, we only know that EB-5 program is a means to immigrate into this country. In my professional experience, I have not met even one client who wants to invest in EB-5 program for investment return alone. However, after taking hundreds of depositions with immigration attorneys, with clients, with regional center executives, SEC still decide to treat EB-5 program as securities. I wonder when they will get it. It is not a securities program. It is an immigration program. Due to the promise of cheap and easy money, there are hundreds of EB-5 programs populated all across the United States. And many of them are fraudulent or fake programs. Therefore, I believe it is my duty and job to screen these EB-5 programs for my clients. It's an integral part of legal service to my clients. I will conduct legal due diligence upon the EB-5 programs and tell my clients what are the safest projects for them to get a green card. Not for the purpose of maximizing their return. As I said, if they are looking for return, they are not coming for the EB-5 program. There are better investments elsewhere. Because of my bilingual skills, it is convenient for me to act as translator to help facilitate the communications between the regional centers and my clients. I have no idea why the SEC is taking the position that that kind of service can only be offered by stockbrokers. SEC accuses ABCL, an overseas consulting company that I set up, is a sham. That is not supported by any fact. To provide EB-5 related legal services to Chinese clients, I am competing with hundreds of Chinese immigration agencies in China. I traveled and stayed in China for several months each year. And I set up three offices in Beijing, Shanghai and Shenzhen. And I hired local consultants for each office in April 2013. A year later, in April 2014, to formalize the consulting business overseas, I set up ABCL and opened a bank account in Hong Kong. Before I set up ABCL, I didn't even have a bank account in China. And that's why I have to use my relatives to receive the payments from the regional centers to cover our expenses overseas. After setting up ABCL, all the payments go into the ABCL bank account in Hong Kong. I think it's a totally legitimate business. I don't know there's any law prohibiting U.S. citizens or U.S. attorneys setting up overseas, providing overseas services. I know none. While China is liberalizing its economy by removing any licensing requirement for immigration services, SEC, on the other hand, is imposing broker registration requirement on immigration attorneys. In order for the American EB-5 program to gain overseas clients, it is a standard industry practice for EB-5 program operators to pay an incentive fee to marketing agents, attorneys, overseas immigration agencies who can bring overseas clients to them. These are American regional centers. They don't have access to overseas markets. And EB-5, by definition, have to get investors from overseas. So there is a need for third-party service. The payment of such marketing cost is always disclosed in the offering documents by these regional centers. I want to refer to the Lorienti case, where there is a victim saying standard commission is not always material. During the SEC investigation, many clients, I just said before, during the depositions and also during, also produced 28 declarations saying that those fees are not important to them and they are coming for the green card. I subjectively do not believe there is a conflict of interest. The reason is I only received this fee if their immigration application was approved. So my interest is aligned with them. I have to select the best project for them so that they can get a green card. And if their green card application was denied, the entire investment and the administration fee they paid will be refunded back to them. So nobody gets anything. That's the industry practice. Does whether or not they get a green card depend on anything having to do with how the investment works out? Well, it's not depends on whether the project is profitable. It depends on whether the project create enough jobs. Because U.S. is concerned about the job creation through EB-5 program, not about whether this individual investor make money or lose money. It doesn't matter. Like I can give you example. Some projects collapsed after investment. However, during the process, they create enough jobs and those investors still get a green card. Council, if I might just ask you a question. I mean, I understand your point on the conflict of interest issue that your incentives and those of your clients are aligned. You both want the application to succeed so that the visa is forthcoming. But isn't the conflict of a different kind? If you're – apparently there is some variability in the administrative fee. If your clients knew that you were going to receive substantial commissions once the application is successful, they could say to you, why should we be paying all those administrative fees if you're going to be getting all of these commissions? We understand there is some variability. We want those fees substantially reduced. And that may have to – that might have to come out of your commission and it might result in reduction of your commission. So isn't there – just to finish the question. Isn't there a conflict of that kind? Well, if you view that as an option for rebate or to have the knowledge so you can maybe bargain, if that you think is a right, is a property right, for someone to bargain with a service provider, yeah. Then you can say, yeah, okay, you didn't have – some people may not have the knowledge. Even though the documents already says the administrative fee will be paid for covering the marketing cost. So these people know there's an administrative fee and those fees will be used for some marketing cost, but they may not know who gets it. What troubles me about this case, I don't know the answer to it, is that you could have structured your arrangement with your clients as an attorney's fee. Yes, definitely. No, stop, stop, stop. Because you're way over your five, so let me ask the question. All these SEC cases are about structure. They're not necessarily about whether you did a bad thing or a good thing. I'll accept for present purposes that you did a good thing because you have all these supporters here. But it's the structure here that we ought to be talking about and not the goal. You could have said I charge a legal fee and there's also some people over here that you can deal with and I might even charge you a referral fee for going to them. But instead, let me finish, but instead you sold a package. And my question is why isn't that package a security? Your Honor, actually some smart attorney, better smarter than me, they did this or that. They told their clients, okay, I'm going to get some fees from the regional centers, and you would agree to recognize those as attorney fees. Since here we're talking about structure, not substance, the structure looks like a security to me. That's what struggles. Structure looks like, yeah. But the thing is, at that time, nobody thought that SEC will come in after immigration attorneys and treat it as security than treat us as brokers. That's not in anyone's mind back in 2010 when this thing getting popular. Not until 2014, SEC come in, try to police the space. All right, counsel, you've had over 10 minutes, and so why don't you sit down? Let's hear what the SEC has to say. Thank you very much. Good morning, Your Honors. May it please the Court, I'm Carrie Dingell on behalf of the Securities and Exchange Commission. Now before I address some of the specific questions that the panel had, I think it would be helpful to just take a step back and explain why the Commission is operating in this space and why we brought this case in particular. So the EB-5 investment program was created by Congress as an immigration program and an investment program. The purpose is to bring foreign capital to the U.S. to create jobs. Now a few years after the program was created, as Judge Hurwitz recognized, the regional centers were created, which permitted pooling of investor funds. Now that is when the Commission's interest was triggered because when you have a capital formation scheme that permits pooling of passive investor funds to be managed by someone else, that's the essence of the security. So the regional center program wasn't much used until after the financial crisis. In 2007, there were 11 regional centers. Now there are 885 regional centers. And that makes sense because credit dried up and this became a newly attractive source of capital. Now USCIS polices immigration fraud in the program, basically ensuring that the investors and the regional centers meet the program requirements and that no one is lying to get into the country. The Commission, on the other hand, polices the financial fraud that occurs in the program, which is generally by the sellers of these investments to end investors. Now Mr. Fung was an immigration attorney, but he wasn't just acting as an attorney. He was making agreements with the regional centers to allocate him specific spots in regional center offerings to sell to his clients. And he wasn't disclosing to his clients that the regional centers were paying him, in many cases, much more than they were paying him for legal advice. What if he had disclosed? Wouldn't these still be securities? Oh yes. So the non-disclosure is real. I mean, this is not a fraud case. This is a fraud case. But it's also an unlicensed brokerage case, right? Correct, Your Honor. So the 15A claim is that Mr. Fung failed to register as a broker. But you'd still have the unlicensed brokerage claim even if he had disclosed. Even if he had fraud out of it and he had disclosed, disclosure would not have cured that claim because he was still acting as a broker of these securities. Could you get disgorgement under the 15A claim? Yes, Your Honor. We would get the disgorgement under any of the individual claims that we brought, including the 15A claim. And that's because the disgorgement was of the amount of the commissions that were paid. And he wouldn't have been able to obtain any of those commissions. Because he was unlicensed. Because he was an unlicensed broker. And so those were illicit gains that flowed from the 15A violation, in addition to flowing independently from the fraud violation. And the fraud violation is failure to disclose the commissions. So there are two. We actually have two theories on our fraud violation. There's a Rule 10b-5b, omission claim that he should have disclosed these commissions to his clients. And then there's also a Rule 10b-5a and c claim that he undertook additional deceptive conduct. Is there a materiality requirement for the commission omission? There is a materiality requirement. Does it make a difference that the clients don't care? Well, I don't think that there is evidence in the record that none of the clients cared. But that's not what materiality requires. So if only one client cares, you can get relief? The materiality requirement is not the same as a reliance requirement. And so I think that's the distinction. Well, because it's an omission, it's sort of hard to rely on an omission. That's what I was thinking. It's really an argument that if I had said this, you wouldn't have done it. Correct. But materiality in the context of an omission just means would the information that was omitted have changed the total mix of information on which investors were relying? And that doesn't necessarily mean that the investors would have made a different decision if they had the information. Although here, there is plenty of evidence in the record that investors would have wanted to know that he was receiving a commission. And he himself acknowledges that they would have wanted to know that. Well, that's why he structured this deal, because he was concerned that they would care, right? Precisely. And so he has acknowledged that there's materiality in this case. The source of the duty to disclose the commission, that's portrayed as a fiduciary duty that arises from his role as a lawyer for these clients. Is that correct? Yes, Your Honor. So I guess this is a policy argument he makes. Because he's already subject to those kind of fiduciary duties, why is it necessary for the SEC to impose additional obligations on him when he's already subject to those stringent fiduciary duties of a lawyer? Because, Your Honor, here he was acting as an unregistered broker of these securities, and his fiduciary obligations as a lawyer don't overlap entirely with his obligations as a broker. But I think regardless, either way, if he was acting as a lawyer or a broker... In what way do they differ? What obligations does he have as a broker in this situation that he would not have as a lawyer? So brokers have an obligation to disclose third-party compensation that they receive in connection with transactions under Exchange Act Rule 10b-10. But isn't that the conflict that he was required to disclose as a lawyer? Yes, Your Honor. And so I think regardless of whether you look at whether he's acting as a broker or a lawyer, he would have been required to disclose that. Now, this case sits right at the intersection of someone acting as a broker who has a fiduciary obligation that the court recognized in Laurenti. So if he were a registered broker, would the analysis be any different? No, Your Honor. If he were a registered broker, he would still have an obligation to have disclosed this information to his clients. Can you address, because I'm not sure I focused on it before this Canadian no-action letter. I'm not sure that anything you do administratively binds us anyway, but I'm interested in it. No, so just as a preliminary matter, no-action letters are not binding. We don't pay any attention to what you say. In addition, though, the Canadian program actually prohibited a return on the investment. And so here, getting back to some of the questions that the panel had initially, the administrative fee is not part of the security in this case. The security is the $500,000 capital contribution, and for every one of these investments, there was a rate of return associated with it. In the CanAccord no-action letter, that program actually prohibited there from being any return. And so you didn't have the return that this court recently in SEC v. Lew said was sufficient to make the security. So let's go back to the question I tried to ask before. Let's assume I go to a broker that charges me enormous fees, and he gives me good investments that provide a 7% rate of return, but given the fees that he charges, I can never make any money on it. Are those investments still securities? Absolutely, Your Honor. They are securities. A broker fee has never been considered in any case to outweigh the return on an investment that makes it count as a security. Those are two separate things that might both be related to the transaction, but the broker fees are not part of the security. Just like here, the administrative fee is not part of the security. And let me just, if I may... Security is the investment in the regional center. Precisely. Let me just, if I may, explain sort of what's at stake. If you permit the administrative fee to negate the fact that this is a security, you're essentially allowing the issuers of these securities to structure the product in such a way to make it not a security and to take it out of the SEC's reach, despite the fact that these issuers are calling these securities. They are marketing them as securities, and they are enticing investors by offering securities. This is a strange case in that respect. Normally, we get cases where something is not labeled as a security, and you're arguing that it is. This is a case in which something is sort of labeled as a security, and the other side's arguing that it isn't. So the roles are sort of reversed here. Exactly, Your Honor, and that's why I think that it is important to look at the purpose of the securities laws. This is a capital formation scheme created by Congress. One of the Commission's core missions is to protect capital formation. So it makes all of the sense in the world that we would be enforcing in this space. So just, I guess, to be sure that I understand, because opposing counsel focused so much on this expectation of profit. It's your position, and in his analysis, he talked about how you should calculate the administrative fees into the expectation of profit. Your position is that's simply an irrelevant factor. It should not be considered at all in deciding whether the expectation of profit factor in the Howey test is met. You only look at the placement memorandum, which describes, I gather, the range of interest that is allowed over time. That's what you focus on, not the administrative fees at all. Is that your position? That's exactly correct, Your Honor. In the court, in the recent SEC v. Lew case that we submitted a 28-J letter on, in that case, the investments were identical to the investments here. There was a rate of return associated with those investments, and the court held that those were securities, despite the fact that, in that case, there was an administrative fee that outstripped the rate of return, such that there was no gross expectation of profit. But I would further submit to the court that Howey doesn't require an expectation of gross profit, and if you look at the Supreme Court's subsequent decision in SEC v. Edwards, it makes it clear that gross profit is just one of the things that can be considered profit under Howey. You also included other periodic payments or a return, which is what you have here. Was there any evidence that the investors actually received profits from their investments? Your Honor, I believe it's not in the record, but to the extent that the investors received, you know, what they had bargained for, then they would have... You mean the green card? The green card and their money back with interest. So it's not... So if you separate the pooling and make that the security, they did make profit on that, they made interest on it? Yes, Your Honor. Why wasn't it a loan under those circumstances? It wasn't a loan? Why wasn't it a loan rather than a security? Well, it's a security because it meets the definition of an investment contract under Howey. You have an investment of money in a common enterprise with the expectation of profits to be derived from the efforts of others. So here there's no question that all of the other elements are met. These were limited partnership interests. Someone else was managing the money. The money was pooled from passive investors. The only issue in this case is... And I suppose the interest was dependent on the success of the venture. Yes, Your Honor. If the venture failed, then investors wouldn't have received their money back with interest, which is what the commission cares about. They also wouldn't have received their green cards. If the venture failed, they wouldn't have received their green cards? If the venture failed without creating the requisite jobs... Right, but if they created the jobs and failed, they would receive their green cards. Yes, Your Honor. Strange program. If the court has no further questions, I would ask you to affirm the judgment of the district court. All right, thank you very much, counsel. Mr. Holmes, I will give you two more minutes. A couple of points. Flip it around, just on the securities issue for a second. Flip it around, and if you had somebody claiming that this extra administrative fee somehow wasn't a security because it wasn't part of what was invested, the SEC would be jumping all over and saying, of course it's a security. You're elevating form over substance. You can't make that argument with a straight face. They're doing the same thing here. It's just in reverse. Let me address some of the other issues. The broker issue. Obviously, we don't think he should be held to be a broker in this circumstance either because, among other things, as we pointed out, he never had custody of client funds save for one, I'm sorry, two. There were a couple of instances that we footnoted where he had custody, but this is not under SEC v. Kramer, SEC v. M&A West, SEC v. MAP, the kind of a case where if those were the rubrics that were followed, that he would be found to have been acting as a broker. Counsel, why not accept the fact that he has to register as a broker and carry on his business as he is? What is so objectionable about having to meet those requirements? Well, for one, he would have to pay a big fine and things like that retrospectively because of what happened here. Going forward, if that's what we're supposed to do and that's the law, then okay, then that's what you do. He probably, because of his action, wouldn't be able to be registered because of the collateral effects. But if that's the clear obligation, then fine. Our argument is it's not clear. And under the gray area, which is this deliberately vague system of, well, a couple of things here, a couple of things there, and magically you have to register as a broker, then that's not enough. But to the extent that he had intimations that he might have had to register as a broker, he could have sought guidance on whether he had to do that. Could he not? From the SEC? I suppose that's possible. There's no record on either side of that, so I can't answer that. As a general proposition, you practice in this area. I mean, individuals who may be skirting close to the requirements to register as a broker can seek guidance as to whether they should or should not do that. I suppose they can. And that goes to the last issue of the fraud, which is his subjective intent is being ignored here. There's a conflation of materiality and scienter. And we've put in evidence that we think was excluded, those declarations from the clients, but there's also deposition testimony that is in the record that says that we didn't care about him getting a commission or anything or whatever you want to call it. We cared about our green card. So that should have been in anyway. But regardless, even if you assume materiality, which I don't think you should, but even if you do, you still have to look at his scienter. And as Judge Wardlaw, I know you're familiar with the Venazza case. You were on that panel. Not all conflicts are material. And even the Laurenti case says that. And under the supplemental authority we provided under Robare, however you pronounce it, you have to look at the actual subjective intent. You can't just assume from one to the other. So why isn't the evidence that the rebates were designed as coming from the company, the enterprise, as opposed to from your client, even though they really were coming from your client? Why doesn't that give rise to an inference of fraud? Well, it depends. You're talking about fraud. You're talking about a subjective mental state where he's trying to defraud someone. Sure, he's hiding from the clients who may or may not care. He's hiding from the clients that they're not really getting a rebate on their investment. They're getting he's cutting his fees. Yeah, well, the analogy is I decide that, you know, I run a store. I decide that, you know, if somebody comes in, I'd like to sell something to them at a discount for that person only. Does that mean that I then have to tell everybody else that ever comes in that I've discounted it? No, no. Look, the analogies are a lot of fun. But the representation in this case is that you'll get back your investment plus interest, right? When somebody says, I want my investment back, and they're not going to get it all back because the company is not ready to rebate it, he puts his money into it and says, see, your investment worked. Well, you don't get the marketing feedback. You don't get the administrative feedback. I understand. But it wasn't the company rebating at all, was it? I'm sorry? It wasn't the company rebating. It was him rebating. No, it was the company. And then where did the source of funds come from? The company. Did he take a haircut on his fees to the company? Yes? Well, no. I thought the evidence was it comes out of his commission. It comes out of his commission. It comes out of the amount that he would have otherwise received, but he never had custody of that money. Okay, that custody is different. I'm just saying. But that was not disclosed to the clients, was it? No, that was not disclosed. We're over time. There's a private placement memorandum in this case. Have you ever seen a case where there's a private placement memorandum where it wasn't designed to be a security? Yeah, there are lots of, yes. It may fit in exceptions, but. Well, this is a classic case of somebody seeking an attorney's opinion who said, you know what? Do it as a PPM just in case somebody calls it a security. Okay. All right. Thank you, counsel. The case of the Securities and Exchange Commission versus Mr. Fung is submitted, and this court will take a brief recess before we take up the next case. All rise.
judges: Nguyen, Owens, Baylson